Simons, J.
(dissenting). I would affirm. The plurality has adopted a definition of family which extends the language of the regulation well beyond the implication of the words used in it. In doing so, it has expanded the class indefinitely to include anyone who can satisfy an administrator that he or she had an emotional and financial "commitment” to the statutory tenant. Its interpretation is inconsistent with the legislative scheme underlying rent regulation, goes well beyond the intended purposes of 9 NYCRR 2204.6 (d), and produces an unworkable test that is subject to abuse. The concurring opinion fails to address the problem. It merely decides, ipse dixit, that plaintiff should win.
Preliminarily, it will be helpful to briefly look at the legislative scheme underlying rent regulation.
Rent regulation in New York is implemented by rent control and rent stabilization. Rent control is the stricter of the two programs. In 1946 the first of many "temporary” rent-control measures was enacted to address a public emergency created by the shortage of residential accommodations after World War II. That statute, and the statutes and regulations which followed it, were designed to monitor the housing market to prevent unreasonable and oppressive rents. These laws regulate the terms and conditions of rent-controlled tenancies exclusively; owners can evict tenants or occupants only on limited specified grounds (9 NYCRR part 2104 [State]; 2204 [City of New York]) and only with the permission of the administrative agency.
The rent-stabilization system originated in 1969. It is a less onerous regulatory scheme, conceived as a compromise solution to permit regulation of an additional 400,000 previously uncontrolled properties but also to allow landlords reasonable latitude in controlling the use of the newly regulated properties. One of its principal purposes was to encourage new construction. As both the Rent Control Law and the Rent Stabilization Law make clear, the Legislature contemplated that eventually rent control would end as rent-controlled tenancies terminated, and thereafter became subject to rent *217 stabilization (see generally, Sullivan v Brevard Assocs., 66 NY2d 489, 494-495; 8200 Realty Corp. v Lindsay, 27 NY2d 124, 136-137). These programs were adopted notwithstanding the Legislature’s expressed sentiment that the "ultimate objective of state policy” was the "normal market of free bargaining between a landlord and tenant” (compare, legislative finding for Emergency Tenant Protection Act of 1974 [the enabling legislation for rent stabilization], L 1974, ch 576, § 4 [§ 2], McKinney’s Uncons Laws of NY § 8622, with legislative finding for Local Emergency Housing Rent Control Act [the enabling legislation for the city Rent Control Law], L 1962, ch 21, § 1 [2], McKinney’s Uncons Laws of NY § 8602). Manifestly, judicial decisions which permit the indefinite extension of rent-controlled tenancies run counter to the legislative goal of eventually eliminating rent control while maintaining some measure of stability in the residential housing market.
A limited exception to the general rule that rent-controlled properties, when vacated, become subject to rent stabilization is found in section 2204.6 (d). It provides that: "(d) No occupant of housing accommodations shall be evicted under this section where the occupant is either the surviving spouse of the deceased tenant or some other member of the deceased tenant’s family who has been living with the tenant” (9 NYCRR 2204.6 [d] [emphasis added]).
Occupants who come within the terms of the section obtain a new statutory rent-controlled tenancy. Those eligible are identified by the italicized phrase but nowhere in the regulations or in the rent-control statutes is the phrase or the word "family” defined. Notably, however, family is linked with spouse, a word of clearly defined legal content. Thus, one would assume that the draftsman intended family to be given its ordinary and commonly accepted meaning related in some way to customary legal relationships established by birth, marriage or adoption. The plurality, however, holds that the exception provided in the regulation includes relationships outside the traditional family. In my view, it does not.
Analysis starts with the familiar rule that a validly enacted regulation has "the force and effect of law” (see, Molina v Games Mgt. Servs., 58 NY2d 523, 529; Matter of Bernstein v Toia, 43 NY2d 437, 448); it should be interpreted no differently than a statute (Matter of Cortland-Clinton, Inc. v New York State Dept. of Health, 59 AD2d 228, 231). As such, the regulation should not be extended by construction beyond its *218 express terms or the reasonable implications of its language (McKinney’s Cons Laws of NY, Book 1, Statutes § 94) and absent further definition in the regulation or enabling statutes, the words of the section are to be construed according to their ordinary and popular significance (People v Cruz, 48 NY2d 419, 428).
Central to any interpretation of the regulatory language is a determination of its purpose. There can be little doubt that the purpose of section 2204.6 (d) was to create succession rights to a possessory interest in real property where the tenant of record has died or vacated the apartment (Matter of Herzog v Joy, 53 NY2d 821, affg 74 AD2d 372). It creates a new tenancy for every surviving family member living with decedent at the time of death who then becomes a new statutory tenant until death or until he or she vacates the apartment. The State concerns underlying this provision include the orderly and just succession of property interests (which includes protecting a deceased’s spouse and family from loss of their longtime home) and the professed State objective that there be a gradual transition from government regulation to a normal market of free bargaining between landlord and tenant. Those objectives require a weighing of the interests of certain individuals living with the tenant of record at his or her death and the interests of the landlord in regaining possession of its property and rerenting it under the less onerous rent-stabilization laws. The interests are properly balanced if the regulation’s exception is applied by using objectively verifiable relationships based on blood, marriage and adoption, as the State has historically done in the estate succession laws, family court acts and similar legislation (see, Matter of Lalli, 43 NY2d 65, 69-70, affd 439 US 259). The distinction is warranted because members of families, so defined, assume certain legal obligations to each other and to third persons, such as creditors, which are not imposed on unrelated individuals and this legal interdependency is worthy of consideration in determining which individuals are entitled to succeed to the interest of the statutory tenant in rent-controlled premises. Moreover, such an interpretation promotes certainty and consistency in the law and obviates the need for drawn out hearings and litigation focusing on such intangibles as the strength and duration of the relationship and the extent of the emotional and financial interdependency (see, Morone v Morone, 50 NY2d 481, 486; People v Allen, 27 NY2d 108, 112-113). So limited, the regulation may *219 be viewed as a tempered response, balancing the rights of landlords with those of the tenant. To come within that protected class, individuals must comply with State '' laws relating to marriage or adoption. Plaintiff cannot avail himself of these institutions, of course, but that only points up the need for a legislative solution, not a judicial one (see, Matter of Robert Paul P., 63 NY2d 233, 235, n 1; Morone v Morone, supra, at 489).
Aside from these general considerations, the language itself suggests the regulation should be construed along traditional lines. Significantly, although the problem of unrelated persons living with tenants in rent-controlled apartments has existed for as long as rent control, there has been no effort by the State Legislature, the New York City Council or the agency charged with enforcing the statutes to define the word "family” contained in 9 NYCRR 2204.6 (d) and its predecessors and we have no direct evidence of the term’s intended scope. The plurality’s response to this problem is to turn to the dictionary and select one definition, from the several found there, which gives the regulation the desired expansive construction.* I would search for the intended meaning by looking at what the Legislature and the Division of Housing and Community Renewal (DHCR), the agency charged with implementing rent control, have done in related areas. These sources produce persuasive evidence that both bodies intend the word family to be interpreted in the traditional sense.
The legislative view may be found in the "roommate” law enacted in 1983 (Real Property Law § 235-f, L 1983, ch 403). That statute granted rights to persons living with, but unrelated to, the tenant of record. The statute was a response to our unanimous decision in Hudson View Props. v Weiss (59 NY2d 733; see, legislative findings to ch 403, set out as note *220 after Real Property Law § 226-b, McKinney’s Cons Laws of NY, Book 49, at 130). In Hudson View the landlord, by a provision in the lease, limited occupancy to the tenant of record and the tenant’s "immediate family”. When the landlord tried to evict the unmarried heterosexual partner of the named tenant of record, she defended the proceeding by claiming that the restrictive covenant in the lease violated provisions of the State and City Human Rights Laws prohibiting discrimination on the basis of marital status. We held that the exclusion had nothing to do with the tenants’ unmarried status but depended on the lease’s restriction of occupancy to the tenant and the tenant’s "immediate family”. Implicitly, we decided that the term "immediate family” did not include individuals who were unrelated by blood, marriage or adoption, notwithstanding "the close and loving relationship” of the parties.
The Legislature’s response to Weiss was measured. It enacted Real Property Law § 235-f (3), (4) which provides that occupants of rent-controlled accommodations, whether related to the tenant of record or not, can continue living in rent-controlled and rent-stabilized apartments as long as the tenant of record continues to reside there. Lease provisions to the contrary are rendered void as against public policy (subd [2]). Significantly, the statute provides that no unrelated occupant "shall * * * acquire any right to continued occupancy in the event the tenant vacates the premises or acquire any other rights of tenancy” (subd [6]). Read against this background, the statute is evidence the Legislature does not contemplate that individuals unrelated to the tenant of record by blood, marriage or adoption should enjoy a right to remain in rent-controlled apartments after the death of the tenant (see, Rice, The New Morality and Landlord-Tenant Law, 55 NYS Bar J [No. 6] 33, 41 [postscript]).
There is similar evidence of how DHCR intends the section to operate. Manifestly, rent stabilization and rent control are closely related in purpose. Both recognize that, because of the serious ongoing public emergency with respect to housing in the City of New York, restrictions must be placed on residential housing. The DHCR promulgates the regulations for both rent-regulation systems, and the eviction regulations in rent control and the exceptions to them share a common purpose with the renewal requirements contained in the Rent Stabilization Code (compare, 9 NYCRR 2204.6 [d], with 9 NYCRR 2523.5 [b]). In the Rent Stabilization Code, the Division of *221 Housing and Community Renewal has made it unmistakably clear that the definition of family includes only persons related by blood, marriage or adoption. Since the two statutes and the two regulations share a common purpose, it is appropriate to conclude that the definition of family in the rent-control regulations should be of similar scope.
Specifically, the rent-stabilization regulations provide under similar circumstances that the landlord must offer a renewal lease to "any member of such tenant’s family * * * who has resided in the housing accommodation as a primary resident from the inception of the tenancy or commencement of the relationship” (9 NYCRR 2523.5 [b] [1]; see also, 2523.5 [b] [2]). Family for purposes of these two provisions is defined in section 2520.6 (o) as: "A husband, wife, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, nephew, niece, uncle, aunt, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law, or daughter-in-law of the tenant or permanent tenant”.
All the enumerated relationships are traditional, legally recognized relationships based on blood, marriage or adoption. That being so, it would be anomalous, to say the least, were we to hold that the agency, having intentionally limited succession rights in rent-stabilized accommodations to those related by blood, marriage or adoption, intended a different result for rent-controlled accommodations; especially so when it is recognized that rent control was intended to give way to rent stabilization and that the broader the definition of family adopted, the longer rent-controlled tenancies will be perpetuated by sequentially created family members entitled to new tenancies. These expressions by the Legislature and the DHCR are far more probative of the regulation’s intended meaning than the majority’s selective use of a favored dictionary definition.
Finally, there are serious practical problems in adopting the plurality’s interpretation of the statute. Any determination of rights under it would require first a determination of whether protection should be accorded the relationship (i.e., unmarrieds, nonadopted occupants, etc.) and then a subjective determination in each case of whether the relationship was genuine, and entitled to the protection of the law, or expedient, and an attempt to take advantage of the law. Plaintiff maintains that the machinery for such decisions is in place and that appropriate guidelines can be constructed. He refers *222 particularly to a formulation outlined by the court in 2-4 Realty Assocs. v Pittman (137 Misc 2d 898, 902) which sets forth six different factors to be weighed. The plurality has essentially adopted his formulation. The enumeration of such factors, and the determination that they are controlling, is a matter best left to Legislatures because it involves the type of policy making the courts should avoid (see, People v Allen, 27 NY2d 108, 112-113, supra), but even if these considerations are appropriate and exclusive, the application of them cannot be made objectively and creates serious difficulties in determining who is entitled to the statutory benefit. Anyone is potentially eligible to succeed to the tenant’s premises and thus, in each case, the agency will be required to make a determination of eligibility based solely on subjective factors such as the "level of emotional and financial commitment” and "the manner in which the parties have conducted their everyday lives and held themselves out to society” (plurality opn, at 212).
By way of contrast, a construction of the regulation limited to those related to the tenant by blood, marriage or adoption provides an objective basis for determining who is entitled to succeed to the premises. That definition is not, contrary to the claim of the plurality, "inconsistent with the purposes of the rent-control system” and it would not confer the benefit of the exception on "distant blood relatives” with only superficial relationships to the deceased (plurality opn, at 210). Certainly it does not "cast an even wider net” than does the plurality’s definition (plurality opn, at 211, n 1). To qualify, occupants must not only be related to the tenant but must also "[have] been living with the tenant” (see, 22 NYCRR 2204.6 [d]). We applied the "living with” requirement in 829 Seventh Ave. Co. v Reider (67 NY2d 930), when construing the predecessor to section 2204.6 (d), and refused to extend the exception to a woman who occupied an apartment for the five months before the death of her grandmother, the statutory tenant, because she was not "living with” her grandmother. We held that the granddaughter, to be entitled to the premises under the exception, was required to prove more than blood relationship and cooccupancy; she also had to prove an intention to make the premises her permanent home. Since she had failed to establish that intention, she was not entitled to succeed to her grandmother’s tenancy. That ruling precludes the danger the plurality foresees that distant relatives will be enabled to take *223 advantage of the exception contained in section 2204.6 (d) (cf., 9 NYCRR 2523.5 [b] [1], [2]).
Rent control generally and section 2204.6, in particular, are in substantial derogation of property owners’ rights. The court should not reach out and devise an expansive definition in this policy-laden area based upon limited experience and knowledge of the problems. The evidence available suggests that such a definition was not intended and that the ordinary and popular meaning of family in the traditional sense should be applied. If that construction is not favored, the Legislature or the agency can alter it as they did after our decisions in Hudson View Props. v Weiss (59 NY2d 733, supra) and Sullivan v Brevard Assocs. (66 NY2d 489, supra).
Accordingly, I would affirm the order of the Appellate Division.
Judges Kaye and Alexander concur with Judge Titone; Judge Bellacosa concurs in a separate opinion; Judge Simons dissents and votes to affirm in another opinion in which Judge Hancock, Jr., concurs; Chief Judge Wachtler taking no part.
Order reversed, with costs, and case remitted to the Appellate Division, First Department, for consideration of undetermined questions. Certified question answered in the negative.

 For example, the definitions found in Black’s Law Dictionary 543 (Special Deluxe 5th ed) are: "Family. The meaning of word 'family’ necessarily depends on field of law in which word is used, purpose intended to be accomplished by its use, and facts and circumstances of each case * * * Most commonly refers to group of persons consisting of parents and children; father, mother and their children; immediate kindred, constituting fundamental social unit in civilized society * * * A collective body of persons who live in one house and under one head or management. A group of blood-relatives; all the relations who descend from a common ancestor, or who spring from a common root. A group of kindred persons * * * Husband and wife and their children, wherever they may reside and whether they dwell together or not” (citations omitted). The term is similarly defined in the other dictionaries cited in the plurality opinion.